IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASHLEY FLORES : | |
| : | |
| v. : | CIVIL ACTION |
| : | NO. 18-0137 |
| COMMONWEALTH OF PENNSYLVANIA : | |
| PENNSYLVANIA STATE POLICE : | |

**SURRICK, J.**  November  9 , 2018

## MEMORANDUM

Presently before the Court is Defendant's Motion for Summary Judgment. (MSJ, ECF No. 18.) Defendant seeks summary judgment on Plaintiff's claims for relief under Title VII of the Civil Rights Act of 1964. Plaintiff advances claims of sex and race discrimination with regard to her time spent as a probationary state trooper with Defendant, during which Defendant extended her probationary period and subsequently terminated her employment. Defendant's Motion will be denied. Plaintiff has offered evidence sufficient to demonstrate the existence of genuine issues of material fact on the issues of (1) whether Plaintiff was qualified for her position, (2) whether Defendant's adverse employment actions concerning Plaintiff raise an inference of discrimination, and (3) whether Defendant's reasons for its adverse actions are legitimate or pretextual.

### I. BACKGROUND

#### A. Factual Background

Plaintiff Ashley Flores is a Hispanic woman of Puerto Rican descent. (*See* Pl. Dep. 44-45.) She completed training at the Pennsylvania State Police Academy in September of 2015 to become a state trooper with the Pennsylvania State Police. (*See* Pl. Dep. 10-11.) Following completion of training at the Academy, Plaintiff, like all prospective troopers, was required to

1

undergo twelve months of on-the-job training as a probationary trooper. (*See* Pl. Dep. 33.) To complete her probationary training, Plaintiff was assigned the State Police Patrol Unit of Troop K in Media, Pennsylvania. (*See* Pl. Dep. 30-31.)

During the probationary period, in order to evaluate Plaintiff's fitness as a trooper, Plaintiff's immediate supervisors issued to Plaintiff, and all probationary troopers, three probationary trooper evaluations ("PTEs") and a more comprehensive General Investigation Report ("GI Report"). (*See* Pl. Dep. 33-34; Policy AR 5-2 § 2.08, MSJ Ex. 2.) A trooper's GI Report is used to determine if the trooper should advance to non-probationary status, have their probationary period extended, or be dismissed. (*See* Policy AR 5-2 § 2.09.)

The parties do not dispute that Plaintiff received satisfactory marks during her time at the Academy and in her PTEs and that she graduated as one of the Academy's "top cadets." (*See* Pl. Dep. 21-23, Resp. Ex. A, ECF No. 20; MSJ 15.) Plaintiff contends, and Defendant does not dispute, that Plaintiff's performance was specifically praised at the Academy and in her PTEs. (*See* Pl. Dep. 21-23; PTEs, Resp. Ex. H.) None of Plaintiff's PTEs, submitted between January and May of 2016 by the first of several supervisors that Plaintiff had throughout her time at Media, made any negative comment about Plaintiff. (*See* PTEs.) Plaintiff's PTEs consistently stated that she: "displayed an understanding of Department . . . procedure," "writes a detailed and efficient report," "submit[s reports] in a timely fashion," "is nearly at or exceeding the station average in most categories [of productivity]," "has shown to be honest and has given no reason to question her integrity," "pays attention to her surroundings when handling incidents for safety," and "[has] traffic knowledge and enforcement [] on par with a trooper of her experience level." (*Id.*)

2

In May of 2016, Plaintiff's supervisor was replaced, and her new supervisor prepared Plaintiff's first GI Report after two months of supervising Plaintiff. (*See* Pl. Dep. 31; Maguire GI Report, MSJ Ex. 6.) This GI Report, although largely positive, stated several deficiencies in Plaintiff's performance regarding "Department Policy, timeliness of paperwork submission, and enforcement efforts." (*Id.* at PSP00092.) Specifically, the GI Report stated that Plaintiff has difficulty submitting her reports on time and correctly, "spends a significant amount of time on station . . . [and] tends to socialize more than others while on station," and "is significantly behind when it comes to traffic arrests." (*Id.* at PSP00093-94, PSP00098.)

Plaintiff does not dispute that she submitted late reports, made mistakes in her reports, and spent more time at the station than her male colleagues. (*See* Pl. Dep. 57, 114-15, 164-65, 186-91.) However, the parties dispute the severity of this conduct and whether Plaintiff was punished for these mistakes equally with other troopers who made the same mistakes. Plaintiff testified that the males in her troop were given more time to complete overdue reports, and one of Plaintiff's supervisors confirmed that at least one other trooper, a white, non-Hispanic male, had such overdue reports. (*See* Pl. Dep. 57; 164-165; Maguire Dep. 21, MSJ Ex. 10, Resp. Ex. F.) Plaintiff testified that her supervisor would not criticize other troopers whose reports were routinely "a mess." (Pl. Dep. 57, 165, 175-176.) In addition, Plaintiff contends that she had to be at the station more often than her male colleagues because restrooms for women were either not as safe or not as available in the field as those for men. (*See* Pl. Dep. 114-115.) She argues that her male colleagues were never disciplined for regularly watching TV in the station, which Plaintiff equates to socializing. (*See id.*) Moreover, this socializing for which Plaintiff was criticized routinely involved her male colleagues making inappropriate sexual comments about Plaintiff's body, requesting to watch Plaintiff work out or to send nude photos of herself, and

3

describing their sexual dreams about her. (*See* Pl. Dep. 45-55, 173-174.) Finally, Plaintiff testified that, during this same time period, at least two other Caucasian male troopers displayed "more serious/worse performance issues" than those of which Plaintiff was accused, yet Plaintiff's supervisor did not issue negative GI Reports to those troopers. (*See* Pl. Resp. to Interrogs. 6-7, Resp. Ex. 12.)

In any event, Plaintiff's GI Report recommended that Plaintiff's probationary period be extended, and it was. (*See* Maguire GI Report PSP00091.) As a result of this negative GI Report, Plaintiff was issued an "Action Plan" to assist her in correcting her performance. (*See* Action Plan, MSJ Ex. 9.) The Action Plan directed Plaintiff to, *inter alia*: "[w]ork the midnight shift" in order to, as Plaintiff understood, obtain greater experience with DUI citations; attend trainings; and review Department regulations. (*Id*.)

However, the parties dispute whether Plaintiff was denied the opportunity to correct her supposed poor performance during this time, in favor of her white, non-Hispanic male colleagues. For example, Plaintiff received only six opportunities to work the midnight shift while, in comparison, several specifically-named, white, male, non-Hispanic troopers were offered more of these shifts – as many as 26. (*See* Def.'s Supp. Answ. to Pl.'s Interrog. No. 12, 2, MSJ Ex. 14; Pl. Dep. 119-121.) Plaintiff was also denied, for no specified reason, at least one training that she requested to attend. (*See* Aug. 25, 2016 Email, Resp. Ex. I.) Moreover, when she requested to be part of a "warrant detail," she was denied the opportunity in favor of an off-duty Caucasian male who had to be paid overtime. (*See* Pl. Resp. to Interrogs. No. 4.) In addition, Plaintiff testified that, unlike her male colleagues, she was consistently assigned "desk duty," thereby making it more difficult for her to remedy her allegedly poor enforcement efforts. (Pl. Dep. 45-55; 173-174.)

At the end of Plaintiff's extended probationary period, a third supervisor, who was not involved in Plaintiff's PTEs or her first GI Report, prepared a second GI Report dated January 17, 2017. (*See* Pipes GI Report, MSJ Ex. 12.) This second GI Report was largely negative and cited deficiencies regarding Plaintiff's "honesty, integrity, work ethic, and officer safety. . . [and] refusal to follow orders." (*Id.* at PSP00038.) Specifically, the Report stated that Plaintiff improperly and unsafely stopped multiple vehicles at the same time during a traffic enforcement detail, then lied to her supervisor about how she was reprimanded for that incident; improperly submitted shortened and untimely reports; "false[ly] report[ed]" a motorcycle crash when she mischaracterized the incident; and "lied" to her supervisor regarding a criminal complaint that was rejected by a magistrate judge. (*See generally*, Pipes GI Report.) Defendant asserts that these were not "mere 'administrative' shortcomings," but clear violations of Department policy that "could have resulted in both public and officer injuries." (MSJ 18; Feb. 17, 2017 Mem., MSJ Ex. 20.)

After the issuance of this second negative GI Report, Plaintiff was terminated by letter dated March 1, 2017. (*See* Term. Letter, MSJ Ex. 21.) Plaintiff's termination letter sets forth as the reasons for her termination the same concerns raised in her second GI Report regarding many of the same disputed incidents: "serious integrity concerns and safety concerns," "late reports and falsification of information on reports," "improper and unsafe techniques" during traffic enforcement details, "fail[ing] to call in or complete a CAD entry, properly vet license/registration information and query operators/vehicles through CLEAN/NCIC" during traffic stops, and being "named the subject of an Internal Affairs Division investigation due to the allegation of falsification of reports/records, improper enforcement, improperly document an incident and investigation, insubordination, and late submission of reports." (*Id.*)

At her deposition, Plaintiff denied much of this conduct. With regard to the conduct that Plaintiff admits, Plaintiff disputes both the severity and the equal enforcement of the conduct. Plaintiff does not deny that she engaged in the traffic enforcement conduct that the second GI Report described as "improper and unsafe," but she disputes the characterization of the conduct as improper and unsafe, and maintains that "countless other troopers conducted stops the same way. . . yet they were not disciplined." (Pl. Dep. 74-78, 81-83.) Furthermore, Plaintiff directly contradicts the second GI Report's contention that she lied about how her supervisor reprimanded her for the traffic incident, essentially contending that she was not reprimanded at all. (*See* Pl. Dep. 74.) Plaintiff also denies lying on any of her reports, points to her consistently satisfactory marks for honesty on her PTEs, and states that the supervisor who claimed she lied recanted his accusations when she confronted him. (*See* Pl. Dep. 64 (stating that she confronted her supervisor with his accusation, denied lying, and supervisor responded, "yes, we know that. . ."); *see generally* PTEs.) Plaintiff does admit to mistakenly submitting an incorrect report regarding the DUI. (*See* Pl. Dep. 65-69.) However, contrary to Defendant's assertions regarding the severity of the conduct, Plaintiff adds that this was a "common error" that a male known to Plaintiff had previously made and gone unpunished. (*Id*.)

The parties do not dispute that the PTEs directly contradict the GI Reports.[1] (*See* Resp. 10-11; MSJ 10-11.) However, the parties dispute the significance of the contradictions. On the

---

[1] There are also contradictions within the first GI Report itself. For instance, Plaintiff received a positive "supervisor's notation" regarding her "thorough investigative work," but another statement by a different supervisor included the comment that "I often found investigative errors [in Plaintiff's reports] that required correction." (Maguire GI Report PSP00096.) The author of this first Report stated that Plaintiff "rarely seeks my guidance" (*Id.* at PSP 00093), yet another supervisor of Plaintiff's stated in the Report that "[s]he does not hesitate to seek guidance when she has a question" (*Id.* at PSP00098). The Report also criticizes Plaintiff for "lacking motivation in the area of enforcement" (*Id.* at PSP00091), yet includes a statement by a supervisor that Plaintiff "is dedicated to doing her job" (*Id.* at PSP00097).

6

one hand, an upper-level supervisor of Plaintiff's stated at his deposition that GI Reports are much more comprehensive than PTEs, and that they uncover greater misbehavior than a PTE. (*See* Raykovitz Dep. 36, MSJ Ex. 5.)  A reviewer of the GI Report also commented that it "is not uncommon" for a trooper to receive positive PTEs and a subsequent negative GI Report. (Studenroth Dep. 34-35, MSJ Ex. 1.)  On the other hand, that same reviewer of the GI Report noted at her deposition that, if Plaintiff had been deficient in the stated areas at the time the PTEs were given, those issues would have been noted in the PTEs.  (*See id.* at 32.)  In addition, multiple levels of reviewers raised concerns about the discrepancies, implying that such discrepancies are uncommon.  (*See* Raykovitz Dep. 36; Aug. 22, 2016 Email, Resp. Ex. J; Aug. 17, 2016 Mem., Resp. Ex. K.)

  **B.**  **Procedural Background**

On January 11, 2018, Plaintiff filed a Complaint alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) *et seq.*, for race discrimination and sex discrimination, including a hostile work environment, with regard to the extension of her probationary period and the ultimate termination of her employment.  (ECF No. 1.)  Defendant filed its Answer on March 12, 2018.  (ECF No. 5.)  On September 10, 2018, Plaintiff filed an Amended Complaint that included allegations of sex and race discrimination under the Pennsylvania Human Relations Act (43 P.S. §§ 951-963).  (Am. Compl., ECF No. 16.) Defendant filed an Answer on September 21, 2018.  (ECF No. 17.)  On September 28, 2018, Defendant filed the instant Motion for Summary Judgment.  Defendant argues that there are no genuine disputes of material fact and that the Court may resolve this case as a matter of law. Plaintiff filed a Response on October 12, 2018.  In her Response, Plaintiff counters that Defendant ignores substantial factual disputes in the record.  Plaintiff also withdrew her claims

7

under the Pennsylvania Human Relations Act and her claims for hostile work environment. On October 30, 2018, Defendant filed a Reply. (ECF No. 22.)

**II.   LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *See id*.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the nonmovant bears the burden of proof on a particular issue at trial, the movant's initial burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials [that the moving party has cited] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). Materials in the record that may be used to support a party's contention that there is a genuine dispute of material fact include depositions, affidavits, interrogatories, "or other materials." *Id.* Summary judgment is appropriate if the nonmovant fails to respond with a factual showing "sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III. DISCUSSION

As noted above, Defendant contends that there is no genuine issue of material fact as to Plaintiff's race and sex discrimination claims, and the Court may resolve this case as a matter of law. "In a Title VII case, the court's task is to determine whether upon viewing all of the facts and the reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986) (citing *EEOC v. Hall's Motor Transit Co.*, 789 F.2d 1011, slip op. at 9 (3d Cir. filed 1986); *Graham v. F.B. Leopold Co.*, 779 F.2d 170, 173 (3d Cir. 1985). Plaintiff has satisfied that burden.

### A. Applicable Law

Title VII makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] . . . sex . . ." 42 U.S.C. § 2000e-2(a)(1). Generally, when there is no direct evidence of discrimination, courts analyze discrimination claims under the *McDonnell Douglas* burden-shifting paradigm. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this three-part analysis, Plaintiff must first establish a *prima facie* case of discrimination by a preponderance of the evidence. *See Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). To establish a *prima facie* case of sex and/or race discrimination, Plaintiff must show that (1) she belongs to a protected class, (2) she is qualified for the position, and that (3) Defendant subjected her to an

9

adverse employment action, (4) under circumstances giving rise to an inference of discrimination. *See id*. If Plaintiff succeeds in establishing the foregoing, the burden shifts to Defendant to "articulate some legitimate, nondiscriminatory reason" for Plaintiff's termination. *Id*. (quoting *McDonnell Douglas*, 411 U.S. at 802). If Defendant meets this burden, Plaintiff must establish by a preponderance of the evidence that Defendant's proffered reasons are a pretext for discrimination. *See id*.

The facts underlying Plaintiff's race and sex discrimination claims appear to be identical. We will therefore assess the facts as they pertain to those claims together. The parties do not dispute that Plaintiff belongs to race- and sex-based protected classes. She is both Hispanic and female. The parties also do not dispute that Plaintiff was subject to two adverse employment actions: the extension of her probationary period and her ultimate termination. The parties do dispute: (1) whether Plaintiff was qualified to advance from the status of probationary trooper to non-probationary trooper, (2) whether the extension of her probationary period and ultimate termination give rise to an inference of discrimination, and (3) whether Defendant's reasons for those actions are legitimate or pretextual.

### B. Whether Plaintiff was Qualified

Viewing all of the facts in the light most favorable to Plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether Plaintiff was qualified to advance from probationary to non-probationary status. The record contains direct contradictions concerning what qualifications Plaintiff was expected to have and whether Plaintiff possessed those qualifications.

Defendant contends that the two GI Reports setting out Plaintiff's alleged misconduct establish that Plaintiff was not qualified to be a non-probationary trooper. (MSJ 15-18.) In

10

support of this argument, Defendant cites *Fowler v. City of Philadelphia Records Dep't*, No. 16-6700, 2018 WL 1705960 (E.D. Pa. Apr. 9, 2018). In *Fowler*, the court stated that, when a plaintiff's employment is determined by "objective criteria," such as that outlined in Plaintiff's Position Description here (Position Description PSP 501, MSJ Ex. 24), the relevant issue a court must determine is whether the Plaintiff "[met] the 'standard of performance expected of all [similarly situated employees.]'" *Fowler*, 2018 WL 1705960, at *2 (quoting *Weldon v. Kraft, Inc.*, 896 F.2d 793, 799 (3d Cir. 1990)). Here, the parties' depositions, reports, and communications directly contradict one another regarding whether Plaintiff did in fact meet such criteria. In addition, there is substantial disagreement regarding whether the criteria Defendant cites was in fact objective and "expected of all [similarly situated employees]." Plaintiff has introduced evidence that her comparators were not held to the same standards. (*See* Pl. Dep. 40-41, 45-55, 66-67, 69, 119, 173-74; Pl. Resp. to Def.'s Interrogs., Resp Ex. M; Def.'s Supp. Answ. to Pl.'s Interrog. No. 12, 2; Maguire Dep. 21.) Therefore, there exists sufficient evidence to create a genuine issue of material fact as to whether Plaintiff was qualified to advance to non-probationary trooper status.

### C. Whether There is an Inference of Discrimination

Next, there exists sufficient evidence to create a genuine issue of material fact as to whether Defendant's actions give rise to an inference of discrimination because the record contains direct contradictions regarding whether similarly situated white, non-Hispanic, male employees of Defendant were treated similarly.

An inference of discrimination "[can] be supported in a number of ways, including . . . comparator evidence," *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 703 n.2 (3d Cir. 2010). When relying on comparator evidence, a plaintiff must demonstrate that he or she is similar to

11

the comparator(s) in "all relevant respects." *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) (citation omitted). To show similarity, a plaintiff may show that "the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (internal quotation marks and citations omitted).

Plaintiff primarily relies on comparator evidence to support her contention that she was terminated under circumstances that give rise to an inference of discrimination. (Resp. 21-24.) Defendant argues that Plaintiff cannot use the white, non-Hispanic male troopers in her division as comparators because: (A) her comparators, as non-probationary troopers, were not similarly situated to probationary troopers, (B) there is no evidence in the record to show that such comparators were not disciplined in the same manner as Plaintiff, and (C) Defendant extended one Caucasian male's probationary period, terminated another Caucasian male during the same time period, and gave Plaintiff more midnight shifts than three Caucasian males. (MSJ 21; Def.'s Supp. Answer to Pl.'s Interrog. No. 12, MSJ Ex. 14.)

Plaintiff counters each of these arguments. First, she argues that she and her comparators were similarly situated despite differences in status because they performed the same job, were subject to the same policies and procedures, and reported to the same upper level supervisors. (*See* Resp. 23; Pl. Certification ¶ 4, Resp. Ex. P.) Second, she gives numerous examples of her comparators receiving preferential treatment, including greater opportunities to succeed and little or no punishment for similar conduct. (*See* Pl. Dep. 40-41, 45-55, 66-67, 69, 119, 173-74; Pl. Resp. to Def.'s Interrogs., Resp Ex. M.) At least two of these examples are supported by testimony of supervisors: that Plaintiff received fewer midnight shifts than some Caucasian

males and may have been given less time to complete overdue reports. (*See* Def.'s Supp. Answ. to Pl.'s Interrog. No. 12, 2; Maguire Dep. 21.) Third, Plaintiff argues that Defendant's adverse employment decisions regarding male Caucasian troopers are not relevant to whether Plaintiff was herself subject to discrimination.

With regard to Plaintiff's first argument, in the case of *Boyer v. City of Philadelphia*, No. 13-6495, 2018 U.S. Dist. LEXIS 151709, at *22 (E.D. Pa. Sep. 5, 2018), Judge DuBois made the following observation: "[w]here rank is irrelevant to the seriousness of the misconduct . . . [i]t would be manifestly unfair to exclude evidence of individuals who committed comparable misconduct and were disciplined by the same supervisor simply because they have a different job title or rank." We agree. Plaintiff's comparators are appropriate even though the record is not clear as to whether Plaintiff's comparators are fellow probationary troopers. Plaintiff is not required to use other probationary troopers as comparators. Plaintiff and her white, non-Hispanic male colleagues, probationary or not, allegedly engaged in identical or similar conduct, were eligible for the same opportunities, had the same job responsibilities, were subject to the same policies and procedures, and reported to the same ultimate supervisors. (*See* Pl. Certification ¶ 4.)[2] *See also Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011) (stating that comparators were inappropriate when plaintiff and his or her comparators had

---

[2] Defendant cites *Peake v. Pa. State Police*, 644 F. App'x 148 (3d Cir. 2016), in support of its argument that Plaintiff cannot compare herself to non-probationary troopers' misconduct. (MSJ 20-21.) In *Peake*, the court analyzed whether a probationary trooper had been subject to race discrimination by comparing the plaintiff's treatment to the manner in which other probationary troopers were treated. *See Peake*, 644 F. App'x at 151-152. The court held that the plaintiff failed to demonstrate that the manner in which he had been terminated gave rise to an inference of discrimination because his comparators had engaged in different misconduct than plaintiff. *See id.* at 152. In *Peake*, the plaintiff chose to use probationary troopers as his comparators. *See id.* at 151. The court did not state that he was required to do so. Moreover, unlike *Peake*, Plaintiff here has advanced evidence that her comparators engaged in conduct identical to or very similar to the conduct of Plaintiff.

different job responsibilities, engaged in different kinds of misconduct, and were subject to discipline by different supervisors).

Because these colleagues are proper comparators, it is appropriate to compare Defendant's treatment of the comparators to Defendant's treatment of Plaintiff to determine whether the difference in such treatment raises an inference of discrimination. *See, e.g., Nicholson v. Bradley Graphic Solutions, Inc.*, No. 3-2151, 2004 LEXIS 7153, at *4 (E.D. Pa. Apr. 21, 2004). Here, that determination must be made by the factfinder because conflicting evidence reflects a material factual dispute regarding whether these comparators were given preferential treatment. Defendant insists that Plaintiff has not presented any evidence that her comparators were treated preferentially. (*See* MSJ 19-20.) As mentioned above, Plaintiff has introduced her own sworn deposition and interrogatories, which are supported by the testimony of her supervisors regarding at least two of the events to which Plaintiff testified, and Defendant has not presented any evidence to the contrary. (*See* Pl. Dep. 40-41, 45-55, 66-67, 69, 119, 173-74; Pl. Resp. to Def.'s Interrogs., Resp Ex. M; Def.'s Supp. Answ. to Pl.'s Interrog. No. 12, 2; Maguire Dep. 21.)

Third, Defendant's adverse employment actions with regard to some Caucasian males are not sufficient, in light of other evidence, to foreclose an inference that Defendant discriminated against Plaintiff. An action under Title VII is driven by the defendant's practices that affect the plaintiff as an individual. *Connecticut v. Teal*, 457 U.S. 440, 453 (1982) ("Section 703(a)(2) [of Title VII] prohibits practices that would deprive or tend to deprive '*any individual* of employment opportunities.' The principal focus of the statute is the protection of the individual employee, . . ." (emphasis in original)). The fact that Defendant may have treated some of its employees fairly does not preclude the possibility that it has been discriminatory towards

14

Plaintiff. *See Furnco Construction Corp. v. Waters*, 438 U.S. 567, 579 (1978) ("A racially balanced work force cannot immunize an employer from liability for specific acts of discrimination.").

Also persuasive in our analysis of this element are the stray sexist remarks from colleagues to which Plaintiff was routinely subjected. Although such remarks, standing alone, are not sufficient to support an inference of discrimination, "such remarks can . . . constitute evidence of the atmosphere in which the employment decision was carried out." *Walden v. Georgia-Pacific Corp.,* 126 F.3d 506, 521 (3d Cir. 1997).

The relatively low burden of presenting a *prima facie* case is satisfied here. *See Simpson v. Kay Jewelers*, 142 F.3d 639 (3d Cir. 1998) (stating that plaintiff's burden at *prima facie* stage is "not onerous" (citation and internal quotation marks omitted)). Given the numerous factual disputes and inconsistencies regarding Plaintiff's qualifications, comparators, and other evidence, the Court cannot say as a matter of law that Plaintiff's allegations are insufficient to demonstrate a *prima facie* case of race and sex discrimination.

### D. Whether Defendant's Reasons are Pretextual

Finally, the record is rife with contradictions with regard to whether Defendant's reasons for extending Plaintiff's probationary period and terminating her were pretextual. Given these contradictions, and viewing the facts in the light most favorable to Plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether Defendant's reasons were pretextual.

When a plaintiff advances a *prima facie* case of discrimination, and the defendant responds with "legitimate, non-discriminatory reasons for its action," the burden shifts to the plaintiff to "point to some evidence, direct or circumstantial, from which a factfinder could

15

reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted). To satisfy the first prong of *Fuentes*, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason[] for its action that a reasonable factfinder could rationally find [it] 'unworthy of credence.'" *Id.* at 765.

Defendant argues that the two GI Reports, the depositions of Plaintiff's supervisors explaining the Reports, and Plaintiff's own statements admitting some of the conduct demonstrate that Defendant had "legitimate, non-discriminatory reason[s]" for extending Plaintiff's probation and terminating her employment. (MSJ 24-26.) Defendant notes that Plaintiff's supervisors in fact wanted her to succeed, despite the many shortcomings that they saw in her performance, and extended her probation in order to give her time and training to improve her performance. (*See* MSJ 19, 22, 25 and accompanying exhibits.) Plaintiff points to sources in the record that reasonably serve to discredit Defendant's Reports, such as: positive comments from supervisors regarding her time at the Academy, her three positive PTEs, positive comments by her supervisors and others in the GI Reports themselves, and her own testimony regarding her "top" performance and disparate treatment. (*See* Resp. 25-28.) In addition, Plaintiff argues that such inconsistencies belie her supervisors' stated desire to see her succeed and reasons for extending her probationary period. (*See* Resp. 24.)

Defendant attempts to explain away such inconsistencies by arguing that GI Reports are more in-depth than PTEs and would therefore uncover misconduct that PTEs may have overlooked. (*See* MSJ 10-11; Raykovitz Dep. 36.) However, that argument does not address a

16

deposition statement by one of the Report's reviewers that the PTEs should have covered some of Plaintiff's misconduct if it had been present, such as the timeliness of reports. (*See* Studenroth Dep. 32.) Nor does it explain the many positive comments in the GI Reports themselves, conflicting testimony regarding the significance of the conduct listed in the GI Reports, or the evidence that others appear to have been disciplined differently or not at all for the same conduct.

Defendant also argues that Plaintiff's denial of at least one event of misconduct – relating to whether she was reprimanded for misreporting a motorcycle crash – should be disregarded as "not genuine" because her counsel failed to address that issue when deposing the supervisor who would have reprimanded her. (MSJ 9, n. 7.) A factual dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. A court may take on the role of factfinder at the summary judgment stage only when the evidence is "so one-sided that one party must prevail as a matter of law." *Id.* at 259. Here, Plaintiff has introduced her own testimony to show that she was not reprimanded, while Defendant has introduced (A) an email from the reprimanding supervisor stating that Plaintiff was reprimanded and (B) the fact that Plaintiff did not question the supervisor at the supervisor's deposition. (*See* Pl. Dep. 85-86; Jan 8-9, 2017 Email chain, MSJ Ex. 15.) This evidence is not "so one-sided that one party must prevail as a matter of law." Rather, Plaintiff has presented enough evidence to demonstrate the existence of a genuine dispute of material fact as to this whether Defendant's reasons were pretextual.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment will be denied. An appropriate Order follows.

BY THE COURT:

_____
**R. BARCLAY SURRICK, J.**